**KING & SPALDING LLP**
QUYEN L. TA, (SBN 229956)
*qta@kslaw.com*
101 Second Street, Suite 1000
San Francisco, California 94105
Telephone: (415) 318-1227
Facsimile: (415) 318-1300

ARWEN R, JOHNSON, (SBN 247583)
*arwen.johnson@kslaw.com*
KELLY PERIGOE, (SBN 268872)
*kperigoe@kslaw.com*
633 West Fifth Street, Suite 1600
Los Angeles, California 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

**CITY OF SANTA ANA**
JOHN M. FUNK, (SBN 204605)
*jfunk@santa-ana.org*
20 Civic Center Plaza M-29, P.O. Box 1988
Santa Ana, California 92702
Telephone: (714) 647-5201
Facsimile: (714) 647-6515

Attorneys for Plaintiff
CITY OF SANTA ANA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| CITY OF SANTA ANA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF ORANGE, and DOES 1-10.,<br><br>Defendant. | Case No. 8:20-cv-00069-DOC (KESx)<br><br>The Honorable David O. Carter<br><br>**FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA** |

For itself, and on behalf of its residents, Plaintiff City of Santa Ana ("Santa Ana"), a charter city and municipal corporation organized and existing under the Constitution and laws of the State of California, alleges the following:

## INTRODUCTION

1.    Across Orange County, a social crisis continues to unfold.  The number of individuals experiencing homelessness has skyrocketed to unprecedented levels.  Many, if not most, of the individuals experiencing homelessness in Orange County (or the "County") struggle to meet the basic necessities of life, including food, shelter, and health care.  They often combat mental illness, substance abuse, physical disabilities, or any combination of these afflictions.  A significant number are veterans and single women with children.  As described below, the COVID-19 pandemic has exacerbated the crisis and revealed, even further, the systemic disparities arising from the County's practices with regard to the homeless population.

2.    Homeless individuals have been dying in 2020 at nearly twice the rate of deaths during the same period last year.  According to coroner data obtained by the Voice of OC, 34 individuals experiencing homelessness died in Orange County in April 2020.  This is nearly double the monthly average of 18 deaths per month during the prior 12 months.

3.    Orange County has failed to take adequate steps to address this crisis by sufficiently providing shelter and services to individuals experiencing homelessness throughout the County.  The County has publicly admitted that it has failed to spend tens of millions of dollars available for homeless housing and services for the County's homeless population.  Moreover, the services that the County has provided, including the County's only purportedly low-barrier shelter, The Courtyard, have been disproportionately located in Santa Ana, a city with the highest Hispanic population and one of the lowest average incomes in the County.

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

4.     Rather than spreading resources throughout the County's three Service Planning Areas ("SPAs"), Orange County has caved to pressure from wealthier and whiter communities in the South SPA, who have successfully opposed shelters being built in their own backyards and communities.  As a result, individuals experiencing homelessness in the North and South SPAs have no choice but to relocate to Santa Ana for shelter and services (either on their own or with the help of non-profits).  Or, they are transported by law enforcement officers to Santa Ana, thereby placing a disproportionate burden on Santa Ana to address the County's homelessness crisis.

5.     Homelessness advocates seeking to compel the County to do its part to address the crisis have sought intervention from this Court, including by filing *Orange County Catholic Worker et al. v. Orange County et al.*, Case No. 8:18-cv-00155-DOC-JDE (the "OCCW Litigation").  This resulted in a July 23, 2019 settlement agreement between Orange County and the plaintiffs (the "OCCW Settlement Agreement").  Among other things, the OCCW Settlement Agreement required the County to adhere to certain guidelines for the operation of its shelters, required the Orange County Sheriff's Department (the "OCSD") to offer an individual experiencing homelessness an appropriate shelter placement within his or her SPA before it could enforce anti-camping laws against that individual, and further prohibited the OCSD from transporting individuals experiencing homelessness across SPA boundaries.

6.     The OCSD, however, has continued its practice of transporting homeless individuals in breach of the OCCW Settlement Agreement, bringing homeless individuals into Santa Ana from across the County during the remainder of 2019, and, on information and belief, continuing throughout 2020.  In addition to directly transporting homeless individuals from other SPAs to Santa Ana, the OCSD has also engaged in a sustained pattern of de facto transport by arresting

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

homeless individuals who are then transported to the County Intake Release Center in Santa Ana, where they are ultimately released without transportation back to their city of arrest, or even the ability to make a phone call.  Predictably, many or most such individuals remain in Santa Ana upon release, seeking shelter and services from Santa Ana.  This is hardly surprising, given that the County has failed to take the necessary steps to provide sufficient shelter and services elsewhere.  Thus, while the County purports to be in compliance with the OCCW Settlement Agreement, by these practices, it is not.

7.      The COVID-19 pandemic has exacerbated the influx of the County's homeless population into the streets of Santa Ana and shone an even brighter light on the inequities arising from the County's practices.  In response to the pandemic, the County has imposed onerous COVID-19 testing requirements at The Courtyard, making it nearly impossible for a person experiencing homelessness (or anyone) to meet.  The Courtyard has also severely reduced capacity at the facility, causing many individuals who seek shelter at The Courtyard to be turned away because the shelter is full.  Hundreds of those individuals remain unsheltered in the vicinity of the facility, without any way to return to their cities of origin. Meanwhile, despite the feasibility of opening emergency shelters in a short timeframe (as demonstrated by Santa Ana's ability to open The Link in less than 30 days), the County has failed to open sufficient additional emergency shelters to make up for the reduced capacity at The Courtyard.  The County has turned a blind eye to the homelessness crisis and failed to address the influx of people who remain in the vicinity of The Courtyard, unsheltered.

8.      As a result of these practices by Orange County, as the homelessness crisis worsens across the County, the number of individuals experiencing homelessness has increased at a disproportionately faster rate in Santa Ana. Whereas the number of individuals experiencing homelessness in Orange County

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

increased by 43% from 2017 to 2019, the number of individuals experiencing homelessness in Santa Ana increased by a staggering 77%.

9.     As of April 2019, more than 25% of the individuals experiencing homelessness from across the County's 34 cities and unincorporated areas lived in Santa Ana.  In other words, more than 1 in 4 of the County's homeless population are located in Santa Ana.  This is by far the largest number of individuals experiencing homelessness of any city in Orange County, even though Santa Ana is one of the County's poorest, most diverse cities, least able to address the impacts of homelessness.

10.     As Santa Ana has expended millions of dollars to rise to the challenge of providing services for its growing population, including individuals experiencing homelessness, Santa Ana and its residents have been forced to bear a disproportionate share of the responsibility of caring for the County's homeless population.

11.     Santa Ana must regretfully file this Complaint in order to obtain:

     a.     A fair and equitable distribution of responsibilities for homeless services among the County;

     b.     A cessation of systemic practices that have led to the relocation of the County's homeless population from other SPAs to Santa Ana in violation of the OCCW Settlement Agreement, of which Santa Ana is a third-party beneficiary; and

     c.     Reimbursement and sustained funding by the County for Santa Ana's decades-long efforts to relieve homelessness in Orange County.

History—including numerous lawsuits and futile requests for assistance—makes clear that such a result is not likely to be voluntarily achieved.  The homelessness crisis will not be ameliorated without legal action and a systemic course correction.

## THE PARTIES

12.     Plaintiff City of Santa Ana is and at all relevant times has been a charter city and municipal corporation organized and existing under the Constitution and laws of the State of California.

13.     Defendant County of Orange is and at all relevant times has been a political and geographical subdivision of the State of California having its principal offices in the City of Santa Ana.

14.     Plaintiff does not know the true names and capacities, whether individual, corporate, associate, or otherwise, of DOE defendant 1 through DOE defendant 10, inclusive, and therefore sues these parties under fictitious names pursuant to Local Civil Rule 19-1.  Plaintiff will amend this complaint to show their true names and capacities when the same have been ascertained.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction to enforce the OCCW Settlement Agreement.  Pursuant to the terms of the OCCW Settlement Agreement, this "Court shall retain jurisdiction over the OCCW and Ramirez Actions for a period of three (3) years from the Effective Date of this Agreement . . . for the purposes of (a) overseeing the implementation of this Agreement, and (b) implementing and presiding over the dispute-resolution process. . . to be established by the Court and to which the Parties hereby consent and agree[.]"  OCCW Dkt. 318-1 at 16.

16.     Pursuant to the Court's July 23, 2019 Order approving the OCCW Settlement Agreement, this "Court retains jurisdiction to enforce the terms of the Settlement as agreed to by the parties, including implementation of the Dispute Resolution Process, for the period of time specified in the Settlement."  *Id*. at 2.

17.     This Court also has jurisdiction to award the relief sought herein pursuant to the All Writs Act, which states that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

18.     Venue is proper in this Court under 28 U.S.C. section 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## CITY DEMOGRAPHICS AND RELATIVE HOMELESS POPULATIONS

19.     The City of Santa Ana has a population of approximately 341,000 and covers 27 square miles.  It is ethnically diverse with the following make-up:  78% Hispanic, 10% Asian, 9% White, and other ethnicities in smaller percentages.  The average median income in Santa Ana is approximately $54,500, as compared to the median income in Orange County, which is 38% higher at $75,400.  Santa Ana has the highest Hispanic population in the County and is one of the lowest income cities in the County.

20.     In January 2017, the Orange County Continuum of Care Point-in-Time Count and Survey found there were 4,792 homeless individuals in Orange County, more than half of whom were unsheltered.  According to the April 2019 Orange County Continuum of Care Point-in-Time Count, the number of homeless individuals in Orange County had increased by 43% to 6,860.  Of these individuals, over half, or 3,961, were unsheltered.

21.     During the same time period that homelessness numbers increased by 43% countywide, they increased by a staggering 77% in Santa Ana, and the percentage of Orange County's homeless population that lives in Santa Ana jumped from 20% in 2017 to 26% in 2019.

22.     According to the 2017 Orange County Continuum of Care Point-in-Time Count and Survey, 1,000 of Orange County's individuals experiencing homeless were in Santa Ana, 466 of whom were unsheltered.  By the April 2019 Point-in-Time count, however, that number increased to 1,769 homeless

1    individuals in Santa Ana, 830 of whom are unsheltered.

2         23.    A separate 2018 survey conducted by Santa Ana reveals additional

3    details about the population of unsheltered individuals located in Santa Ana.  On

4    March 31, 2018, a point-in-time count conducted by Santa Ana city staff and

5    volunteers revealed there were at least 1,617 individuals experiencing

6    homelessness within city borders—including 1,030 unsheltered individuals, 81%

7    of whom were chronically homeless (for one year or more).  Santa Ana's count

8    established that 52% of the unsheltered individuals counted came from outside

9    Santa Ana and identified 32 Santa Ana public schools located within 1,000 feet of

10   a homeless encampment.  More than 9.6% of those surveyed were directed to

11   Santa Ana by a person or agency, such as law enforcement or a non-profit.

12        24.    According to records kept by the Santa Ana Police Department's team

13   devoted to homelessness, between January 1, 2020 and July 31, 2020, 57% of the

14   individuals experiencing homelessness with whom the team interacted came from

15   *outside* of Santa Ana.

16   ### ORANGE COUNTY'S UNDERSPENDING ON HOMELESSNESS

17   ### AND CONCENTRATION OF SERVICES IN SANTA ANA

18        25.    Despite the wealth and size of Orange County and the considerable

19   financial resources available to the County, the County has shirked its own

20   responsibilities by declining to spend available funding on homelessness services.

21        26.    The County has publicly admitted that it has retained untold millions

22   of dollars in unspent funding for homelessness.  As this Court recognized during a

23   February 13, 2018 hearing in the OCCW Litigation, County Supervisor Todd

24   Spitzer told the Anaheim City Council in September 2017 that "the county has

25   hundreds of millions of dollars to spend to assist the homeless and it has not spent

26   those monies."

27

28

27.     During a March 17, 2018 conference convened by this Court in Santa Ana's council chambers, Supervisor Andrew Do expressly acknowledged the County's shortcomings, stating: "We don't have a defense. I'm going to be the first to own up that we have failed."  He stated: "To lead requires we are proactive and not reactive, and we have failed."

28.     That same month, the Voice of OC reported that Orange County supervisors had at least $230 million in unspent money that the County could use to help address homelessness.

29.     The County continues to lag behind other counties in applying for millions in state dollars, including No Place Like Home grants that fund permanent supportive housing for homeless people with serious mental illnesses.  Orange County applied for $13 million in No Place Like Home grants in 2019, while San Diego County applied for $125 million, despite having fewer homeless people on the streets, according to official counts.  According to the California Department of Health Care Services' February 2019 application data for the Whole Person Care program, the County had budgeted $31 million as compared to San Mateo County, which has a population roughly a fourth the size and budgeted $165 million, and Alameda County, which has a population about half the size and budgeted $283 million.

30.     Despite the consensus among experts that providing permanent supportive housing (such as through Section 8 vouchers)—as opposed to emergency shelters—is the most effective way to eradicate homelessness, on information and belief, the Orange County Housing Authority ("OCHA") has also failed to apply to HUD for the maximum number of Section 8 Special Purpose Vouchers for which it is eligible to apply.

31.     Notably, the Section 8 vouchers that OCHA has applied for and received are not made available to Santa Ana residents.  While residents of most

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

other cities within the County may apply for these vouchers, Santa Ana's cannot.

32.    OCHA has also failed to convert its existing tenant-based Section 8 vouchers to Project-Based Vouchers, which are an even more effective tool than tenant-based vouchers for alleviating homelessness.  Under the Section 8 program, a public housing authority like OCHA is permitted to allocate up to 30% of the tenant-based vouchers it is awarded under its Annual Contributions Contract ("ACC") to Project-Based Vouchers to be made available to homeless individuals.  OCHA, which has approximately 11,100 ACC vouchers, has converted fewer than 100—or about 5%—of those vouchers to Project-Based Vouchers.  By contrast, Santa Ana, which has just over 3,000 ACC vouchers has converted 326—or 10%—of those vouchers to Project-Based Vouchers.

33.    In addition to intentionally underspending on services, the County has concentrated those services in cities like Santa Ana with lower incomes and higher percentages of Hispanic residents—instead of wealthier, majority-white communities.  As a result, for decades, Santa Ana has borne the largest and most inequitable burden of addressing and relieving homelessness in Orange County, whether by providing necessary, related services on its own or by hosting the provision of such services by the County and third parties within its borders.

34.    For example, the only low-barrier emergency shelter operated by the County is The Courtyard, located in Santa Ana.  The County placed The Courtyard in Santa Ana and within proximity of sensitive land uses such as nearby residences, several schools, and two public libraries.  Before the COVID-19 pandemic, The Courtyard provided shelter for more than 400 individuals on a nightly basis irrespective of weather.  Living conditions in The Courtyard have come under severe criticism due to overcrowding, exposure to the elements, the lack of privacy for women, and compliance with the Americans with Disabilities Act.

-10-

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

35.     On March 19, 2018, the Orange County Board of Supervisors voted to add up to 400 new, additional emergency shelter beds on county-owned properties in the cities of Irvine, Huntington Beach, and Laguna Niguel.  This plan would have located 200 homeless people in Irvine, 100 in Huntington Beach and 100 in Laguna Niguel, if needed.

36.     Within one day of the County's approval, however, all three cities vigorously opposed this plan and threatened to sue the County, despite the fact that California law requires all cities to zone for homeless shelters, *see* Cal. Gov. Code § 65580.

37.     City leaders and hundreds of residents, including chartered busloads of residents from Irvine, voiced opposition at the County Board of Supervisors' meeting, while hundreds of protestors rallied outside.

38.     By March 27, 2018, the Board of Supervisors caved to the pressure from these wealthy communities, voting unanimously to rescind its approval of the three-shelter plan.  The County kowtowed to these cities notwithstanding that the County does not need permission from the host city in order to build a shelter, as the County is not legally required to comply with local zoning regulations.

39.     Further yielding to pressure from wealthier residents living in its most prosperous cities, the County has predictably proposed to replace The Courtyard with another shelter, the Yale St. shelter, again to be located in Santa Ana.

40.     The Yale St. shelter is a 62,000 square-foot building that the County plans to convert into a shelter for up to 425 individuals.  It is located about a half-mile south of Santa Ana's Centennial Park, near Godinez High School, The Heritage Museum, and many local businesses in Santa Ana.

41.     Despite vocal opposition from Santa Ana residents at County Board of Supervisors meetings (because Santa Ana has felt the disproportionate impact of the County's homelessness crisis), the County has moved unwaveringly ahead with

plans to build the replacement shelter in Santa Ana, where the population is majority-Hispanic and much lower-income than the cities to which it kowtowed in rescinding the initially approved plan referenced above.  Predictably, there are no other plans by the County for a low-barrier shelter, replacement or otherwise, anywhere else in the County.

42.     In addition to The Courtyard, the County has operated the Orange County Armory Emergency Shelter Program at the National Guard Armory located in Santa Ana ("Santa Ana Armory") and at another located in Fullerton.  This program is operated by the County during nighttime hours only typically from October through April each year.  The two armory shelters accept individuals from all over the County, regardless of which city they come from.  Before the COVID-19 pandemic, the Santa Ana Armory typically could shelter up to 200 individuals.

43.     Because the Santa Ana Armory is typically only a cold-weather shelter that is run seasonally, the approximately 200 residents of the shelter are turned out on to the streets of Santa Ana each year when the County shuts down the Santa Ana Armory.

44.     Moreover, because the Santa Ana Armory is available only during the nighttime hours when it is operating, clients regularly spend daytime hours in and around nearby Delhi Park and in Santa Ana generally, thereby increasing the homeless population in Santa Ana and impacts thereof.

45.     Although there is also a National Guard Armory located in the City of Orange, the County has never operated a shelter at that location.

46.     Orange County also has had a long-standing practice of abandoning individuals experiencing homelessness in Santa Ana.  This includes both direct transportation of individuals experiencing homelessness to Santa Ana and the de facto transportation of such individuals by arresting those individuals from across

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

the County, and then transporting them to Santa Ana to be held at the Intake Release Center there, and ultimately released in Santa Ana.

47.     According to Orange County's June 21, 2018 response to a June 18, 2018 Public Records Act request issued by Voice of OC, for the period from September 1, 2017 to June 18, 2018, the OCSD arrested and transported a total of 238 homeless people to the Intake Release Center in Santa Ana on a combined total of 285 separate occasions.

48.     As set forth below, Santa Ana has raised these concerns about the County and other cities abandoning homeless individuals in Santa Ana in connection with legal actions before this Court.

## ORANGE COUNTY CATHOLIC WORKER LAWSUIT AND RESULTING SETTLEMENTS

49.     On January 29, 2018, the Orange County Catholic Worker and certain individual plaintiffs filed the OCCW Litigation in this Court, entitled *Orange County Catholic Worker et al. v. Orange County et al.*, Case No. 8:18-cv-00155-DOC-JDE, to halt the County's eviction of hundreds of homeless individuals then living in or near the Santa Ana Riverbed.

50.     Santa Ana successfully sought to intervene in the action on the grounds that Santa Ana "has faced quite possibly the most sustained and acute challenge presented by persons experiencing homelessness" of any city in the County, that "it [was] very concerned that without a concrete plan to house individuals after the impending motel stays expire, Santa Ana will see an influx of such individuals—in areas that are already overcrowded, such as the Plaza of the Flags in the Civic Center," and that without Santa Ana's involvement "a resolution of any kind may overlook or fail to take into account Santa Ana's unique and pivotal role in addressing homelessness."  OCCW Dkt. 124 at 3, 15, 17.

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

51.     In similar related litigation by OCCW against the cities in the County's South SPA, those cities successfully moved to recuse this Court, and unlike many other cities, including Santa Ana, the South County cities did not voluntarily intervene as defendants in the OCCW Litigation against the County. With the exception of Laguna Beach, no city in the County's South SPA has entered into any settlement with the OCCW Plaintiffs regarding the provisions of shelter beds or anything else and remain recalcitrant with the County's tacit approval.

52.     On or about February 4, 2018, the Court stayed the County's efforts to evict individuals living at or near the Santa Ana Riverbed and later lifted that stay only after requiring the County to provide 30-day motel vouchers for individuals relocated from the Riverbed and concurrent assessments of those individuals to determine future shelter options and services.

53.     More than 700 persons were relocated from the Riverbed, including single women and veterans.  Later, approximately 200 individuals from the Orange County Civic Center were relocated.

54.     The County entered into the OCCW Settlement Agreement with plaintiffs whereby the County agreed to certain protocols relating to the enforcement of anti-camping and anti-loitering ordinances in those cities and unincorporated areas where the OCSD provides contract law enforcement services. The settlement imposed certain standards and conditions of operation for any County-funded and contracted homeless services.  Although the settlement did not obligate the County to provide any certain number of shelter beds, by imposing Standards of Care (which were recently updated by stipulation between the parties to the OCCW Settlement Agreement), the OCCW Settlement Agreement contemplated that the County would build additional shelters, as otherwise these standards would be unnecessary.  The OCCW Settlement Agreement further

-14-

required that before anti-camping or anti-loitering laws could be enforced against people experiencing homelessness, the OCSD must first locate and offer an appropriate shelter placement for the individual within his or her respective SPA.

55.     The OCCW Settlement Agreement also expressly prohibited the OCSD from transporting homeless individuals across SPA boundaries for purposes of shelter placement.

56.     As this Court explained during the status conference in which the OCCW Settlement Agreement was approved:

> [The agreement] calls upon the [] different portions of the County to make certain that there's a respective responsibility in each portion. Not a shoving off, not a dumping, not a pushing -- but in a sense, an acceptance of responsibility for what we've got.  Homelessness in our area is what we're [going to] take care of.  And we're not going to have that pushed in any way, shape or form in the future over to another SPA. And therefore, this provision contains what I think is exemplary; and that is, and we'll handle our own in the respective SPAs. The different regions that step up, we'll split the cost. And North County is a primary example of that through your leadership. And that is the regional approach. Other cities are primary examples: **Santa Ana first,** followed closely by Anaheim, and then Tustin and Orange and Costa Mesa.

OCCW Dkt. 320 at 33:2-17 (emphasis added).

57.     In approving the OCCW Settlement Agreement, the Court further acknowledged that Santa Ana had long "complained about dumping" and observed that the OCCW Settlement Agreement "stops that dumping.  It stops this moving over the borders.  Each SPA takes care of its own.  Each city takes care of its own."  OCCW Dkt. 320 at 35:13-16.  The Court went on to say, "I think that protects that anger that the citizens here had, that they were receiving, let's say, people from outside a Santa Ana area."  *Id.* at. 35:16-19.

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

58.     Many Orange County cities also reached settlements with the plaintiffs whereby the cities, either alone or in partnership with others, committed to providing various numbers of emergency shelter beds for homeless individuals in and around their communities. These cities were Anaheim, Costa Mesa, Orange, Tustin, and all of the cities in the County's North Service Planning Area, which includes Brea, Buena Park, Cypress, Fullerton, La Habra, La Palma, Los Alamitos, Placentia, Stanton, Villa Park, and Yorba Linda.

59.     Santa Ana also reached its own settlement with the OC Catholic Worker Plaintiffs whereby it agreed to provide a certain number of shelter beds and abide by various protocols for the enforcement of its anti-camping ordinances.

## ORANGE COUNTY'S BREACHES OF THE OCCW SETTLEMENT BY CONTINUING TO TRANSPORT ACROSS SPAs AND FAILING TO PROVIDE SUFFICIENT ACCESS TO SHELTER BEDS

60.     The lawsuit by the OC Catholic Worker and resulting settlements, along with Santa Ana's longstanding role and above efforts to combat homelessness, dramatically raised hopes of global participation by the County and all of its cities in addressing homelessness, a solution long sought by Santa Ana. Indeed, this Court described the OCCW Settlement as "the most significant settlement concerning the homeless issues certainly in this county and perhaps the state," OCCW Dkt. 320 at 7:15-17, and "a game changer," *id.* at 9:14-15.

61.     Similarly, County Supervisor Lisa Bartlett described the settlement agreement as a "very good result . . . certainly for the North [] and Central SPA areas" and an example of "working together with all of the stakeholders to really solve homelessness in [] the county."  OCCW Dkt. 320 at 9:15-19.  Supervisor Bartlett called the January 2019 "point-in-time" statistics reflecting 6,860 people experiencing homelessness in Orange county as a "very doable number to get all those off the street, get [them] into a system of care and to the extent possible into

permanent . . . housing with wrap-around services, and make a tremendous positive impact for our county." *Id.* at 9:20-25.  She further noted:

> [T]he County stands ready also to work with the South County SPA []
> when and if they step up with some shelter capacity.  We are very
> amenable to []stepping in, from the County perspective, with
> additional services, with financial resources to make sure that we get
> something up and running when the cities step up to the plate and []
> create some shelter capacity or something else in South County, so
> then we have a complete system throughout the whole county.

*Id.* at 10:1-10.

62.    Despite this momentum and the promise of the OCCW Settlement Agreement, however, no city in the South SPA, with the exception of Laguna Beach, has committed to providing any shelter beds or offered a sustained, meaningful response to the homelessness crisis.

63.    Even after the OCCW Settlement Agreement was entered, the OCSD continued to transport homeless individuals to Santa Ana across SPA boundaries, in violation of the terms of the agreement.

64.    On information and belief, despite continued admonitions by this Court, homeless individuals continue to be intentionally (and/or, at the very least, foreseeably) abandoned within Santa Ana by various means.  Some are transported for services to Santa Ana and left without a plan for return transportation to the city of origin.  Other homeless individuals are brought to Santa Ana for shelter and remain in Santa Ana if that housing solution ends.  For other homeless individuals, upon information and belief, they are simply transported to Santa Ana by neighboring agencies and ultimately abandoned.  The impact of these actions is severe and disproportionately burdens Santa Ana and its residents.

65.    By way of example, just this month, two officers from the Santa Ana Police Department's homelessness detail had contact with an individual

-17-

experiencing homelessness in Santa Ana. The individual, who immediately asked for shelter, explained to the officers that he was from San Juan Capistrano and Mission Viejo, in South County, where he had first become homeless. He indicated that because there were no resources in South County, he came to Santa Ana for assistance. The individual went to the Mental Health Association of Orange County ("MHA"), located in Santa Ana, where he was able to get food and showers, but the MHA would not give him a referral to a shelter because he did not have a mental health diagnosis. Despite not having shelter, the individual remained in Santa Ana because the MHA continued to provide him food and access to a shower. Per the individual's request, the officers found him shelter at the Santa Ana Armory.

66.     Nearly two months ago, Santa Ana issued a July 8, 2020 Public Records Act request to the OCSD seeking, *inter alia*, records showing the arrest and transport of homeless individuals to the Intake Release Center, as well as service and dispatch logs relating to the transportation of homeless individuals to shelters located in Santa Ana. According to the OCSD's August 3, 2020 correspondence to Santa Ana, the County was "still in the process of extracting and review[ing] a voluminous amount of responsive records related to the calls for service logs."

67.     On August 17, 2020, the County produced service logs for the period from July 24, 2019 to July 8, 2020, which reflected nearly 300 encounters with individuals experiencing homelessness, many of whom were arrested and taken to the Intake Release Center in Santa Ana, including for minor offenses (such as public urination) that simply reflect the reality of experiencing homelessness.

68.     Notably, the OCSD's August 17, 2020 correspondence indicated unequivocally: "The Orange County's Sheriff's Department does not keep statistics related to the transportation of homeless individuals." The OCSD's

failure to track the number of homeless individuals it has transported is apparently intentional.  It has now made it impossible for the County, the OCCW Plaintiffs, third-party beneficiaries of the OCCW Settlement Agreement (like Santa Ana), the public, or any other interested parties to monitor the OCSD's compliance with the OCCW Settlement Agreement's prohibition on the transporting of homeless individuals across SPA borders.  The failure to track this important information makes it possible for the County to violate the Settlement Agreement and to escape attention and accountability.

69.    The OCSD August 17, 2020 correspondence also explained that the OCSD's June 21, 2018 response to a Public Records Act request from the Voice of OC included "statistics that were tracked by the Homeless Outreach Team during that time period," but that "[s]ince then[,] the use of these logs has been discontinued and are no longer available."  In other words, the OCSD acknowledged that since the OCCW Settlement Agreement banned transporting, the OCSD is keeping *less information* about homelessness encounters, and transporting in particular, than they were before the OCCW Settlement Agreement.

70.    The OCSD has acknowledged that it may have additional information responsive to Santa Ana's July 8, 2020 Public Records Act Request.  But it has indicated that it will likely not be able to provide such information before August 31, 2020, the deadline by which Santa Ana was required to file this First Amended Complaint (which the OCSD likely understands).

71.    The OCSD's PRA response—and what it reveals about the OCSD's practice of transporting individuals experiencing homelessness across SPA boundaries into Santa Ana—is particularly important because the OCSD contracts to provide law enforcement services to 13 cities in the County—the vast majority of which are in the South SPA, where the County has walked back its plans to open shelters.

72.     In addition to directly transporting individuals experiencing homelessness to Santa Ana, the County, through the OCSD, as well as many other Orange County cities, engage in a practice of de facto transporting homeless individuals in their jurisdictions to Santa Ana by arresting those individuals, who are then confined in the Intake Release Center, located in Santa Ana.  The County routinely releases inmates who are homeless from its Intake Release Center into Santa Ana without transporting them to their original place of residency or even providing them with a phone call before release.  This practice has dramatically increased the homeless population in Santa Ana.

73.     On information and belief, the County's inmate release process does not take any steps to ensure that the releasees have transportation back to their cities of origin, even though the County is aware of where the inmates were living before their arrest.  The OCSD Inmate Re-Entry Unit's Assessment of Adult Needs form that is used when inmates are discharged has a field for the inmate to report where he or she was living "[b]efore entering jail," but there is no information in the form about referrals or plans for transportation back to that city.

74.     Until recently, the County's practice was to release inmates at midnight, when transportation options were scarce and service providers were closed, rather than during daytime hours.  This practice no doubt further increased the likelihood that releasees would remain on the streets of Santa Ana rather than returning to the cities in which they were previously living.

75.     The County's Intake Release Center release protocols are particularly harmful to Santa Ana because of the practice of city law enforcement officers throughout the County arresting homeless individuals and transporting them to the Intake Release Center in Santa Ana as a means of reducing their homeless populations.  Santa Ana has issued Public Records Act requests to various cities throughout the County.  While the responses of many cities—such as Irvine and

-20-

Los Alamitos—reveal that they do not even *track* the number of homeless individuals that they arrest and transport to the Intake Release Center (or otherwise transport to Santa Ana for shelter), other cities' responses reveal significant numbers of transports to Santa Ana since the OCCW Settlement Agreement on July 23, 2019:

a. Brea has arrested and transported 48 homeless individuals to the Intake Release Center in Santa Ana and has transported four homeless individuals to shelters in Santa Ana.

b. Buena Park has arrested and transported 30 homeless individuals to the Intake Release Center in Santa Ana.

c. Cypress has arrested and transported 13 homeless individuals to the Intake Release Center in Santa Ana.

d. La Habra has arrested and transported 11 homeless individuals to the Intake Release Center in Santa Ana.

e. La Palma has made approximately 27 arrests involving individuals that were transported to the Intake Release Center in Santa Ana.

f. Placentia has arrested and transported 71 homeless individuals to the Intake Release Center in Santa Ana.

g. Finally, Laguna Beach—located in the South SPA—has arrested and transported a staggering 286 homeless individuals to the Intake Release Center in Santa Ana.

Notably, these hundreds of individuals are then released in Santa Ana and not returned to their cities of arrest.

76. The County has also violated the OCCW Settlement Agreement by continuing to enforce its anti-camping and anti-loitering laws notwithstanding that the County's only low-barrier shelter, The Courtyard, is operating at reduced

-21-

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

capacity due to the COVID-19 pandemic, and is turning away individuals who cannot provide negative COVID-19 test results.

77.    For many individuals experiencing homelessness, particularly those who do not have identification, transportation, and/or access to healthcare, the testing requirement imposes a nearly impossible barrier to entry.  Far less restrictive measures, such as temperature and symptom screening, provision of face masks, increased handwashing, and encouraged social distancing, would address the legitimate concerns associated with COVID-19, while maintaining the access to beds required by the OCCW Settlement Agreement.  Moreover, even if the practices implemented at The Courtyard due to COVID-19 are consistent with guidance from the public health authorities, they still do not relieve the County of having to provide enough substitute beds in alternative shelters.

78.    Before the COVID-19 pandemic, The Courtyard had a capacity of more than 400.  Now, however, on information and belief, The Courtyard has begun removing residents from the shelter for minor rule violations that would not previously have warranted removal, without a warning and without access to an alternative shelter, in order to reduce capacity at the facility.  On information and belief, there are now only between 160 and 180 residents living at The Courtyard. Although the County has participated in the Project Roomkey program to house some of these individuals in hotel rooms, the vast majority of those individuals who have been kicked out of The Courtyard have remained on the streets around The Courtyard.

79.    Moreover, on information and belief, the County has begun to require that individuals experiencing homelessness have a note from a doctor proving their illness or vulnerability and/or be in possession of their medication in order to qualify for Project Roomkey.  Like the COVID-19 testing requirement

-22-

implemented at The Courtyard, this requirement is a practically insurmountable hurdle for most individuals experiencing homelessness.

80.     The County has also made unilateral changes to its operation of the armory shelters.  Because of the COVID-19 pandemic, the Santa Ana Armory has continued operating outside of its usual cold-weather season this year, and on information and belief, will be operating for the remainder of the year.  However, it is no longer operating at the National Guard Armory, and has relocated to a Salvation Army facility that can only hold only 100 individuals.  As a result of this move and the resulting reduction in capacity, approximately 100 people who formerly lived at the Santa Ana Armory were forced to leave the shelter, and many of them stayed in Santa Ana rather than returning to their cities of origin.  Significantly, even though the Santa Ana Armory is located in Santa Ana, the County does not consult with the Santa Ana about its operations.

81.     The County has continued to reduce capacity at the new 100-bed location of the Santa Ana Armory.  On information and belief, the County had limited the number of people living at the Santa Ana Armory to 75 as of August 27, 2020, with plans to further limit capacity to 70 people.

82.     On information and belief, the Fullerton Armory has permanently closed, and the County has no plans to ever reopen it, leaving the armory in Santa Ana as the only armory the County is operating as a shelter.  Santa Ana anticipates that the closing of the Fullerton Armory will result in greater demand for the Santa Ana Armory and other shelters located in Santa Ana, thereby leading to a further spike in Santa Ana's homeless population.

83.     The onerous testing requirement at The Courtyard, the changes to the operation of the Armory shelters, as well as the heightened eligibility requirements for Project Roomkey, have resulted in an influx in Santa Ana of homeless

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

individuals who have been turned away from the shelter, further increasing the disproportionate impact on Santa Ana of the County's homelessness crisis.

84.     Because those individuals experiencing homelessness who are from outside of Santa Ana are not eligible for Santa Ana's The Link shelter, the reduction in County shelter beds further makes it more difficult for Santa Ana Police Department ("SAPD") officers to find shelter beds for those individuals because fewer are available, which in turn affects the SAPD's ability to enforce its laws.

**SANTA ANA'S SIGNATURE EFFORTS TO ABATE HOMELESSNESS**

85.     While Orange County has failed to do its share to combat County-wide homelessness, Santa Ana has stepped up its responsibility to address the influx of individuals experiencing homelessness within its borders.

86.     In January 2018, Santa Ana established a multi-disciplinary "Quality of Life Team" ("QOLT") to address the impacts of homelessness and other health and safety concerns in the City.  The QOLT Team's work regularly includes encounters with homeless individuals, the goal of which is to connect such individuals with services, including temporary housing.

87.     The QOLT Team has become a cornerstone of the City's efforts and has now been expanded to two teams, augmented by contractors, that work on a daily basis, including nighttime hours.  It consists of members from several agencies at the City, including law enforcement members specially trained to address homelessness and related issues.  Despite the significant costs, Santa Ana remains committed to the QOLT Team's continued operations.

88.     The SAPD has also redirected many of its resources to homelessness issues.  In September 2017, approximately a year after The Courtyard opened in October 2016, causing an increase in the number of individuals experiencing homelessness, both sheltered and unsheltered, in Santa Ana, the SAPD appointed a

Homeless Liaison Officer to respond to the growing homelessness-related issues in the City.

89.     As more and more of the County's homeless population has relocated or been transported to Santa Ana, the SAPD has steadily increased the number of officers that it has assigned to handle homelessness-related issues exclusively, pulling these officers from their regular patrols.  In October 2019, the SAPD added a second officer devoted to homelessness-related issues.  In March 2020, the SAPD again doubled the number of officers assigned exclusively to homelessness issues, to four officers, and assigned a sergeant to oversee that team.

90.     In July 2020, the SAPD yet again doubled the number of homelessness officers overseen by the sergeant to eight officers, with plans to increase to ten officers in September 2020.  In other words, in the three years since September 2017, the number of officers the SAPD will have devoted to homelessness issues will have increased 11-fold.  Importantly, each of these officers has been reassigned from regular patrols in order to address this worsening homelessness crisis, thereby shifting resources away from other Santa Ana residents in order to fill the void left by the County's inattention to the crisis.

91.     In yet another proactive measure, in November 2018, Santa Ana, with its own financial and other resources, and in only 28 days, constructed and opened a 200-bed low-barrier interim emergency homeless shelter called "The Link."  The Link serves homeless women, men, and families, and is operated under contract with Mercy House Living Centers.

92.     The Link has been a story of success, providing food, restroom and bathing facilities, social services, and temporary shelter to homeless individuals in Santa Ana.  The Link was featured as the front cover story of the April 2019 edition of Western City, the monthly magazine of the League of California Cities.

The Court has acknowledged this project and the City of Santa Ana as a model for the county, state and "maybe the nation."

93.     The Link was originally scheduled to operate for approximately 2 years, to be replaced with a similar facility when it closes, with some overlap.  The replacement facility is now under development.  For the first year of its operation, Santa Ana spent approximately $3.1 million on The Link and is scheduled to spend in excess of $3 million in the second year.

94.     In addition to its emergency shelter, Santa Ana has created 434 units of permanent supportive housing, and has obtained 286 Special Purpose Vouchers from HUD.

95.     While the QOLT Team, The Link, and the permanent supportive housing Santa Ana has implemented are among the most visible measures Santa Ana has taken to combat homelessness, the City expends staff, management, and law enforcement resources on a daily basis in its quest to alleviate homelessness in Santa Ana.

96.     For example, Santa Ana has developed a "Homeless Resource Kit" available to residents and businesses in the City.  This includes a dedicated hotline and e-mail address for questions pertaining to homelessness, and a mobile phone application, known as "MySantaAna" for residents to alert the City of health and safety issues that frequently accompany homelessness. The City's response is to always try to connect homeless individuals with services, including housing at The Link. Only when shelter is offered and declined does the City enforce its anti-camping ordinances against an individual experiencing homelessness, in accordance with applicable law.

97.     Santa Ana has also developed a Santa Ana Homeless Services Data Dashboard, available at https://www.santa-ana.org/homelessness/interim-homeless-shelter-link/santa-ana-homeless-services-data-dashboard, which provides

-26-

the public with data regarding the number of emergency shelter beds in the city, the number of supportive housing units and vouchers, point-in-time data regarding the homeless population, and additional details about referrals made by the QOLT team.

## SANTA ANA CONTINUES TO SHOULDER A DISPROPORTIONATE SHARE OF THE RESPONSIBILITY TO ALLEVIATE THE COUNTY'S HOMELESSNESS

98.     The impacts of homelessness on Santa Ana, and it having to bear a disproportionate share of the responsibility to alleviate homelessness in the County, have been severe and staggering in economic terms.

99.     In 2017, Santa Ana spent approximately $15 million to provide fire and police, security and other necessary services to address homelessness-related issues in and around the Orange County Civic Center and Santa Ana.

100.    The costs to Santa Ana keep rising.  In Fiscal Year 2018-19, Santa Ana spent $16.6 million to address homelessness-related issues at the expense of core services to Santa Ana residents.  This money was spent on a wide variety of services, including police response, clean-up and code enforcement, homeless services, park safety, fire response, and management and legal services.

101.    For Fiscal Year 2019-20, Santa Ana's estimated costs to address and mitigate homelessness are at least $25.4 million (and potentially more), all again for the services described above, and at the expense of core services to Santa Ana residents.

102.    Santa Ana's physical resources have been overwhelmed.  Until April 2018, over 200 homeless individuals lived in the Civic Center in tents and other makeshift shelters, specifically in an area known as the Plaza of the Flags, immediately adjacent to Santa Ana City Hall.  This encampment necessitated the leasing of temporary bathroom facilities and created issues regarding the storage of

1   personal property left unattended in and around the Civic Center.  The

2   circumstances gave rise to the need for near-constant law enforcement presence in

3   the Civic Center.

4        103.   More recently, The Courtyard's restrictive policies have resulted in an

5   increase in individuals experiencing homelessness living in the vicinity of the

6   facility, which has necessitated increased law enforcement presence and

7   expenditure of resources.

8        104.   The Santa Ana police department provides homeless outreach services

9   and addresses quality of life issues for people experiencing homelessness,

10   including suicide attempts, physical assaults, petty crimes, homicide investigations,

11   among a variety of other issues.  City personnel also undertake extraordinary

12   measures to ensure the health and safety of Santa Ana's residents, including

13   collecting abandoned, used, uncapped hypodermic needles, disposing human waste

14   left in public areas, and increasing maintenance services to confront excessive

15   trash.  City Personnel also have implemented weekly power-washing various areas

16   in Santa Ana to minimize Hepatitis A and other health concerns.  All of this is

17   done at Santa Ana's sole expense.

18        105.   Nor is private property in Santa Ana immune from the impacts of

19   homelessness.  This also translates to increased costs for Santa Ana.

20   Encampments, for example, are regularly established on property adjacent to

21   railroad tracks and quickly present health and safety issues.  Litter and debris, both

22   small- and large-scale, from clothing to appliances, clutter the railroad right of way

23   in multiple areas in Santa Ana, transforming them into eyesores and interfering

24   with the use of neighboring land owned by the adjoining residents and businesses.

25        106.   Acting pursuant to its municipal code, and in the absence of action by

26   the railroads, Santa Ana has had to seek multiple inspection and abatement

27   warrants against the Union Pacific Railroad in order to address these issues and

28

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY
OF SANTA ANA

connect homeless individuals with housing and services.  To date, the cost for these efforts has exceeded $150,000, and continues to rise.

## FIRST CAUSE OF ACTION

### Breach of Settlement Agreement

107.   Plaintiff City of Santa Ana incorporates by reference and realleges Paragraphs 1 through 106 as if fully set forth herein.

108.   On or about July 23, 2019, the County and the OCCW Plaintiffs entered into the OCCW Settlement Agreement, a settlement agreement under which the OCCW Plaintiffs dismissed their action against the County and released certain claims against the County in exchange for certain promises by the County with respect to its handling of homelessness-related issues in Orange County.

109.   The OCCW Plaintiffs performed all of their obligations under the OCCW Settlement Agreement, and all conditions required for the County's performance occurred.

110.   Although Santa Ana is not a party to the OCCW Settlement Agreement, Santa Ana is a third-party beneficiary of the agreement and entitled to relief for breach of contract because the County and the OCCW Plaintiffs intended that Santa Ana would benefit from the OCCW Settlement Agreement, as evidenced by, *inter alia*, the Court's remarks during the conference at which the OCCW Settlement Agreement was approved acknowledging that the OCCW Settlement Agreement would address Santa Ana's expressed concerns about "dumping" and the need for each city and County to take care of the crisis within its own borders.

111.   The County has breached the OCCW Settlement Agreement in, *inter alia*, the following ways:

   a.   Since signing the OCCW Settlement Agreement, the OCSD has transported, and continues to transport individuals experiencing

-29-

homelessness across SPA boundaries, including from outside the Central SPA to Santa Ana—both directly and as the result of its practices regarding transportation to and release from the Intake Release Center located in Santa Ana—in violation of the OCCW Settlement Agreement's prohibition on transporting homeless individuals across SPA boundaries; and

b.    The County has reduced capacity at its only low-barrier shelter, The Courtyard, and instituted entry restrictions that are nearly impossible for individuals experiencing homelessness to meet, in violation of the OCCW Settlement Agreement's prohibition on enforcement of anti-camping and anti-loitering laws before there are available beds for at least 60% of the people experiencing homelessness.

112.   The County's practice of transporting individuals experiencing homelessness in breach of the OCCW Settlement Agreement has resulted in the relocation to Santa Ana of hundreds of the County's individuals experiencing homelessness who have been arrested, confined at the Intake Release Center, and ultimately released in Santa Ana.  This has caused harm to Santa Ana in the form of increased costs to Santa Ana associated with, *inter alia*, providing shelter and services to this increased number of individuals and increasing its law enforcement presence.

113.   The County's restrictions on admission into The Courtyard in breach of the OCCW Settlement Agreement has resulted in hundreds of individuals experiencing homelessness being kicked out of, or turned away from, The Courtyard and remaining unsheltered in Santa Ana.  This has caused harm to Santa Ana in the form of increased costs to Santa Ana associated with, *inter alia*,

providing shelter and services to this increased number of individuals and increasing its law enforcement presence.

## SECOND CAUSE OF ACTION

### Breach of Covenant of Good Faith and Fair Dealing

114.   Plaintiff City of Santa Ana incorporates by reference and realleges Paragraphs 1 through 113 as if fully set forth herein.

115.   On or about July 23, 2019, the County and the OCCW Plaintiffs entered into the OCCW Settlement Agreement.  The OCCW Plaintiffs performed all of their obligations under the OCCW Settlement Agreement, and all conditions required for the County's performance occurred.

116.   Although Santa Ana is not a party to the OCCW Settlement Agreement, Santa Ana is a third-party beneficiary of the agreement and entitled to relief for breach of the covenant of good faith and fair dealing because the County and the OCCW Plaintiffs intended that Santa Ana would benefit from the OCCW Settlement Agreement, as evidenced by, *inter alia*, the Court's remarks during the conference at which the OCCW Settlement Agreement was approved acknowledging that the OCCW Settlement Agreement would address Santa Ana's expressed concerns about "dumping" and the need for each city and County to take care of the crisis within its own borders.

117.   As in any agreement, the OCCW Settlement Agreement contains an implied promise of good faith and fair dealing, which prevents the County from doing anything to unfairly interfere with Santa Ana's right to receive the benefits of the OCCW Settlement Agreement.

118.   Among the benefits contemplated by the OCCW Settlement Agreement is that the County would open additional shelters throughout the County, not just in Santa Ana.

119.   The County interfered with Santa Ana's right to receive the benefits of the OCCW Settlement Agreement by failing to make a good faith effort to open an adequate number of County shelters in parts of the County other than Santa Ana.  Instead of following through with approved plans to add up to 400 new, additional emergency shelter beds on county-owned properties in the cities of Irvine, Huntington Beach, and Laguna Niguel, the County has determined to build its only new low-barrier shelter in Santa Ana, and has even *eliminated* existing shelters, like the Fullerton Armory, located outside of Santa Ana.

120.   The County's breach of the covenant of good faith and fair dealing has resulted in individuals who otherwise would have been able to obtain shelter at one of several anticipated County shelters located throughout the County instead leaving the SPA in which they reside in order to seek shelter in Santa Ana.  This has resulted in an increase in the number of the County's individuals experiencing homelessness who are located in Santa Ana, and thus has caused harm to Santa Ana in the form of increased costs to Santa Ana associated with, *inter alia*, providing shelter and services to this increased number of individuals and increasing its law enforcement presence.

## THIRD CAUSE OF ACTION

### Writ of Mandamus (All Writs Act)

121.   Plaintiff City of Santa Ana incorporates by reference and realleges Paragraphs 1 through 120 as if fully set forth herein.

122.   Pursuant to the All Writs Act, federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  As the United States Supreme Court has explained, the All Writs Act authorizes the Court "to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise

obtained." *United States v. New York Tel. Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977).

123.   This authority extends to orders necessary or appropriate to effectuate and prevent the frustration of a settlement agreement that has been entered by the Court and which the Court has retained jurisdiction to enforce, such as the OCCW Settlement. *See Sandpiper Vill. Condo. Ass'n., Inc. v. Louisiana-Pac. Corp.*, 428 F.3d 831, 841 (9th Cir. 2005) ("[A] provision in the settlement agreement and order that expressly retains jurisdiction in the district court for the purpose of overseeing and enforcing the prior judgment . . . , in conjunction with the All Writs Act, empowers a district court to protect its judgment from a subsequent action that frustrates the purpose of the settlement agreement and order.").

124.   As this Court noted, the OCCW Settlement Agreement "calls upon the [] different portions of the County to make certain that there's a respective responsibility in each portion different portions of the County to make certain that there's a respective responsibility in each portion."  OCCW Dkt. 320 at 33:2-3.

125.   The County's failure to do its fair share to address the homelessness crisis throughout the County frustrates this purpose of the OCCW Settlement Agreement.

126.   In order to effectuate and prevent frustration of the OCCW Settlement Agreement, Santa Ana respectfully requests that the Court issue an Order:

      a.   Prohibiting the County from transporting homeless individuals across SPA boundaries into Santa Ana;

      b.   Requiring that the County track (i) the number of individuals experiencing homelessness who OCSD has transported across SPA boundaries; and (ii) the number of individuals arrested by OCSD and transferred to the Intake Release Center in Santa

-33-

Ana, such that it is possible to receive a Public Records Act Request seeking such information within 21 days;

c.      Requiring that the County impose less restrictive entry requirements at The Courtyard and provide additional low-barrier emergency shelter(s) outside of Santa Ana to account for the decreased capacity at The Courtyard;

d.      Requiring that the County Intake Release Center in Santa Ana permanently institute policies (i) providing for transportation of releasees to the city in which they were arrested; (ii) providing a phone call to releasees prior to release; (iii) allowing releasees to charge their cell phones prior to release; and (iv) releasing individuals only during daylight hours rather than in the middle of the night.

e.      Requiring that the County improve access to existing shelters in the County and open additional shelters in parts of the County other than Santa Ana;

f.      Requiring that the County adhere to the Standards of Care incorporated into the OCCW Settlement Agreement in operating the Yale St. shelter, and provide sufficient security for the facility so as not to require SAPD to devote additional officers to law enforcement at the facility;

g.      Requiring that the County consult with the City about the operations of the Santa Ana Armory;

h.      Requiring that the County provide more social services in other parts of the County; and

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

i.      Requiring that the County implement plans to convert the motels being used for Project Room Key to permanent supportive housing.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff City of Santa Ana prays for the following:

1.      Monetary damages according to proof as reimbursement for the costs spent on homeless resources and necessary related services as a result of the County's breaches of the OCCW Settlement Agreement;

2.      Monetary damages according to proof for funding the increased provision of homeless resources and necessary related services as a result of the County's breaches of the OCCW Settlement Agreement;

3.      An injunction and order:

a.      Prohibiting the County from transporting homeless individuals across SPA boundaries into Santa Ana;

b.      Requiring that the County track (i) the number of individuals experiencing homelessness who OCSD has transported across SPA boundaries; and (ii) the number of individuals arrested by OCSD and transferred to the Intake Release Center in Santa Ana, such that it is possible to receive a Public Records Act Request seeking such information within 21 days;

c.      Requiring that the County impose less restrictive entry requirements at The Courtyard and provide additional low-barrier emergency shelter(s) outside of Santa Ana to account for the decreased capacity at The Courtyard;

d.      Requiring that the County Intake Release Center in Santa Ana permanently institute policies (i) providing for transportation of releasees to the city in which they were arrested; (ii) providing

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA

1    a phone call to releasees prior to release; (iii) allowing releasees

2    to charge their cell phones prior to release; and (iv) releasing

3    individuals only during daylight hours rather than in the middle

4    of the night.

5    e.    Requiring that the County improve access to existing shelters in

6    the County and open additional shelters in parts of the County

7    other than Santa Ana;

8    f.    Requiring that the County adhere to the Standards of Care

9    incorporated into the OCCW Settlement Agreement in

10    operating the Yale St. shelter, and provide sufficient security

11    for the facility so as not to require SAPD to devote additional

12    officers to law enforcement at the facility;

13    g.    Requiring that the County consult with the City about the

14    operations of the Santa Ana Armory;

15    h.    Requiring that the County provide more social services in other

16    parts of the County; and

17    i.    Requiring that the County implement plans to convert the

18    motels being used for Project Room Key to permanent

19    supportive housing.

20    4.    Attorney's fees, as permitted by law;

21    5.    Costs of suit; and

22    6.    Such further relief as the Court may deem just and proper.

23

24

25

26

27

28

-36-

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY
OF SANTA ANA

1

2      DATED: August 31, 2020          KING & SPALDING LLP

3                                      QUYEN L. TA

4                                      ARWEN R. JOHNSON
                                       KELLY PERIGOE
5

6

7                               By: */s/ Arwen R. Johnson*

8                                      ARWEN R. JOHNSON

9

10     DATED: August 31, 2020

11                                     CITY OF SANTA ANA
                                       JOHN M. FUNK
12
                                By: */s/ John M. Funk*
13                                     JOHN M. FUNK

14
                                       *Attorneys for Plaintiff CITY OF SANTA ANA*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT AND PETITION FOR WRIT OF MANDAMUS BY CITY OF SANTA ANA